[No. 20868.  Department One.  November 22, 1927.]

COLBY & DICKINSON, INCORPORATED, *Appellant*, v. WILLIAM McCULLOCH *et al.*, *Respondents*, J. S. HARDIE *et al.*, *Cross-Appellants*.[1]

[1] MECHANICS' LIENS (40-1)—NOTICE TO OWNER—NECESSITY. Rem. Comp. Stat., § 1133, requiring notice to the owner, at the time of the delivery of materials to any contractor or agent, as a prerequisite to a materialman's lien, does not apply to deliveries made to the owner contracted for by him, or to his non-statutory agent who was authorized to receive them and who was not the contractor liable on the building contract.

[2] SAME (47)—NOTICE TO OWNER—OWNERSHIP OR POSSESSION OF PROPERTY. Under Rem. Comp. Stat., § 1133, requiring notice to the owner, at the time of the delivery of materials to any contractor or agent, as a prerequisite to a materialman's lien, notice need not be given upon delivery of materials to one who contracted for the construction of a building and was in possession of the land under an agreement to purchase, through a deed in escrow; and it is immaterial that he had caused the record title to pass to another, who had no actual interest but held it in trust or in fraud of creditors.

[3] TRUSTS (10)—EXPRESS TRUST—PAROL EVIDENCE TO ESTABLISH. The rule that an express trust in lands cannot be shown by parol evidence does not apply in an action by creditors to set aside the trust as a fraudulent conveyance.

[4] FRAUDULENT CONVEYANCE (7)—TRANSFERS SUBJECT TO ATTACK BY CREDITORS. A conveyance will be set aside as a fraud upon creditors, when a prospective purchaser of land, upon which he was constructing a building, had the title conveyed to another

[1]Reported in 261 Pac. 86.

and mortgaged to raise the purchase price, and thereby sought to defeat a materialman's liens on the building for want of the statutory notice of delivery to the "owner."

Appeals from a judgment of the superior court for King county, Findley, J., entered April 26, 1927, upon findings in favor of a lien cross-complainant and in part in favor of a mortgagor, in an action to foreclose a materialman's lien, tried to the court. Reversed.

*Alexander & Bundy,* for appellant.
*Agnes Richmond,* for cross-appellants.
*C. E. H. Maloy,* for respondents.

TOLMAN, J.—This action was instituted by appellant, as plaintiff, to foreclose a materialman's lien. The cross-appellants, by cross-complaints or intervention, sought similar relief. The respondent Peoples Savings & Loan Association, by cross-complaint, sought a foreclosure of its mortgage on the same property. After a trial on the merits, the lower court entered its decree establishing and foreclosing a certain lien as prior to the mortgage, in favor of parties not appealing. It denied the lien claims of the appellant and of the cross-appellants, but gave them personal judgments against defendants McCulloch and wife, and directed the foreclosure of the mortgage, subject to the prior liens. Certain liens were also allowed as subsequent and junior to the mortgage.

All of those whose claims of lien were denied are appearing here as appellants and cross-appellants, and all stand in the same position, so that no distinctions need be made between them.

The Loan Association has not appealed from that part of the decree adverse to it, nor have any appealed whose liens were made junior to the mortgage. The only question here presented is, should the lien claims

which the trial court denied be allowed as prior to the mortgage?

The facts, while somewhat involved, are not seriously in dispute on what we regard as the vital points. It appears that, on and prior to June 10, 1926, the title to the real estate here involved was in the Holmes estate, and that, preceding the date mentioned, the respondent William McCulloch had made an oral agreement with the Holmes estate to purchase the land, but nothing had been paid on the purchase price. It seems to have been understood that a deed to the property would be executed and placed in escrow, to be delivered upon the payment of the purchase price, and that, prior to such delivery, McCulloch should enter upon the property, take possession, and commence the construction of a building.

McCulloch did so take possession, and on June 7 employed the respondents Fuller & James to furnish the labor for the construction of the building at a lump sum. They actually commenced to construct the building on June 10, 1926. Before that time, a representative of appellant Colby & Dickinson, Inc., had seen Mr. McCulloch and asked the privilege of submitting figures for furnishing the lumber for the building. He was directed by McCulloch to go to Fuller & James for information as to the lumber required, and requested or permitted to submit his figures to them. The figures were so submitted to Fuller & James, who reported them to McCulloch, and McCulloch directed Fuller & James to order the material from Colby & Dickinson, at the prices mentioned in their estimate. This was done, and appellant commenced to furnish the lumber on June 10, 1926.

The cross-appellants, likewise, at the request of McCulloch or at the request of Fuller & James on behalf of McCulloch, furnished labor and materials which

went into the construction of the building, the commencement dates being, Custer, June 10, 1926; Hardie, July 17, 1926; Kane, July 22, 1926.

A week or so after the commencement of construction work, McCulloch directed a change of plans, so that instead of a one-story house, as at first intended, a two-story house, with a different style of roof, was actually constructed. These changes in the plans increased the cost of the building about eleven hundred dollars, and Fuller & James were instructed by McCulloch to order the additional materials required, and they were furnished at the prices previously agreed upon.

On July 14 following, the Holmes estate executed a deed conveying the real estate to the defendants R. B. Joliffe and wife, and much is left to inference or to the imagination as to why the deed was made to Joliffe instead of to McCulloch. Joliffe testified that he never had any interest in this property and never claimed any; that he had agreed to buy another property from McCulloch which would be encumbered with a mortgage, and apparently, to accommodate McCulloch, he was willing to make application for and execute a mortgage on this property, holding himself ready to convey it, at McCulloch's request; and while he expected some compensation for what he did in the matter, the amount was not agreed upon; but whatever should be agreed upon, apparently, was to be credited to Joliffe upon the contract for the other and different property which he was to purchase and occupy as a home.

McCulloch's version of the arrangement between himself and Joliffe is slightly different. He says, in effect, that Joliffe was to take and hold the title and execute a mortgage, that McCulloch was to build the house with the proceeds of the mortgage, the property

was to be sold and the profits were to be divided equally between them.

None of the other parties to this litigation had any actual knowledge of the arrangement between McCulloch and Joliffe. The Holmes estate, at McCulloch's request, made the deed to Joliffe without inquiry, and received its payment for the land out of the proceeds of the mortgage executed by Joliffe to the Loan Association.

As a part of the same transaction, Joliffe and wife made an application for a mortgage upon this property to the Loan Association to secure a loan of thirty-five hundred dollars, dated July 6, 1926, and the mortgage was executed under date of July 22, and recorded July 23, 1926, the written application for the mortgage containing the usual representations as to ownership, freedom from liens, etc.; and of course the Loan Association knew that the title was being obtained at the same time from the Holmes estate. The loan company also knew that a building was under construction upon the property by McCulloch, at and before the time of the making of the application and of the mortgage. Notwithstanding, it made no effort to see that the proceeds of the loan were applied to the construction cost; but, after disbursing to the Holmes estate the amount necessary to pay for the lot, the remainder of the loan was paid over by checks, drawn to the order of Joliffe, delivered to McCulloch, by him taken to Joliffe for endorsement, and after that endorsement was obtained, the checks were cashed and the proceeds disposed of by McCulloch, as he saw fit, without the intervention or direction of anyone.

The chief defense to these lien claims is that the claimants did not give any notice, as required by Rem. Comp. Stat., § 1133 [P. C. § 9706], to McCulloch and the Holmes estate, or to Joliffe, as the owner of the

real-estate. Other incidental questions are also raised, which will be stated as they are reached for discussion.

[1] At the outset, it may be said that the lack of diligence and the apparent carelessness, upon the part of each litigant likely to suffer loss is such as not to require any undue stretching of the principles of equity on behalf of anyone.

The statute, so far as material here, reads:

"Every person, firm or corporation furnishing materials . . . ., shall, not later than five (5) days after the date of the first delivery of such material or supplies to any contractor or agent, deliver or mail to the owner or the reputed owner of the property, on, upon or about which such materials or supplies are to be used, a notice in writing, stating in substance and effect that such person, firm or corporation has commenced to deliver materials and supplies for use thereon, with the name of the contractor or agent ordering the same, and that a lien may be claimed for all materials and supplies furnished by such person, firm or corporation for use thereon; and no further notice to the owner shall be necessary. No materialman's lien shall be enforced unless the provisions of this act have been complied with."    § 1133, Rem. Comp. Stat.

Our first inquiry must be, Was the delivery here to a contractor or agent within the meaning of the statute? When the history of the materialman's lien law is considered, it becomes at once apparent that the legislature, in the section quoted, intended to cover those cases where materials were sold to a contractor bound by his contract to furnish materials who was primarily liable for the purchase price, the owner being no party to the purchase and his property being only secondarily liable, in the event that the contractor failed to pay. The use of the term "agent" seems to refer back to the prior act (§ 1129, Rem. Comp. Stat.) [P. C. § 9705], which makes every contractor, sub-

contractor, etc., the agent of the owner for the purposes of creating a lien. Therefore, the statutory notice is required when the purchase is made by a statutory agent, but not when made by a non-statutory agent of the owner. In *Architectural Decorating Co. v. Nicklason*, 66 Wash. 198, 119 Pac. 177, the court considered a prior statute having the same purpose, and it was there said:

"The statute covers a situation where three persons are involved, the one who furnished material, the one to whom the material is furnished, and the owner of the building for which they are furnished. The owner has no contractual relation with the first person, and has no means of knowing what materials may be furnished to the second person upon the faith and credit of the building, except as he receives notice through his duplicate bills. Upon receipt of these, the owner is in a position to protect himself against his contractor and the materialman, by checking up the contractor and the materials claimed to be furnished. This is the plain purpose of the statute. Where the owner contracts directly for material, he requires no notice outside of his contract to protect himself. The findings make appellant a contractor and not a materialman, dealing with the owner. The contract was of itself a statement of the materials furnished, and none other was necessary."

The act of a non-statutory agent of the owner in directing a subcontractor to proceed with work was held sufficient to make a direct contract with the owner, in *Ringel v. Newman*, 69 Wash. 583, 125 Pac. 943. In *Brace & Hergert Mill Co. v. Burbank*, 87 Wash. 356, 151 Pac. 803, our present statute was considered and it was squarely held that "when material is furnished upon the order of the owner, manifestly he has no need of notice." And in *Spokane Valley Lumber & Box Co. v. Dawson*, 94 Wash. 246, 161 Pac. 1191, the previous holdings of this court were reviewed, and the principles

announced are well stated in the syllabus, which reads as follows:

"Where materials are furnished to the owner upon the order of the owner's general agent in full control and management of the lands, it is not necessary to give the owner the five days' written notice of the delivery of the materials provided for by Rem. Code, § 1133."

This holding was approved and reaffirmed in *Miller v. Schober,* 111 Wash. 631, 191 Pac. 800, in which case the facts as to the manner of the purchasing of material were strikingly like the facts here. Manifestly, a special agent, duly authorized, would have the same authority to do the particular thing that a general agent would have. We conclude, therefore, that if McCulloch was the owner or reputed owner, within the meaning of the statute, no notice was required.

[2] Was McCulloch such owner? It cannot be argued that the Holmes estate, though holding the legal title at the time appellant began to furnish material, was such owner, or that notice to it would have accomplished any result. Manifestly, it was the intention that title should pass from the Holmes estate before any rights of lien claimants accrued, and if the title had not so passed, it is not contended that, upon the facts now disclosed by the record, even if the statutory notice had been given to it, the title in the Holmes estate would have become subject to these liens. It can hardly be successfully argued that notice should have been given to Joliffe, because at the time when each claimant began to furnish material Joliffe had no title of record, and there was nothing to give notice to them that he had any interest in the property or its title whatsoever. Since their rights were fixed by the first delivery, there was no reason for any claimant to examine the record thereafter.

During the period of first deliveries, June 10 to July 22, the record title was in the Holmes estate, and, as we have already seen, without something beyond what was here shown, that title could not have been subjected to these liens by the giving of the statutory notice to the Holmes estate. McCulloch was in possession and constructing the building under an oral agreement with the owner, unenforceable before the deed was placed in escrow, perhaps, but under which the title did pass from the Holmes estate. It, therefore, retires from the picture, just as certainly as though the contract had at all times been enforceable by law.

Instead of taking title in his own name, which would have clearly been immediately subject to these liens, McCulloch, for purposes of his own, perhaps for the very purpose of defeating these liens, caused the title to be taken by Joliffe. For Joliffe's benefit? No. So far as the transaction is explained, the title was taken in Joliffe's name for the benefit of McCulloch, and it is fair to infer that, if a full and truthful explanation of the transaction were given, that fact would appear even more clearly.

[3] But it is argued by the respondent, if so taken, Joliffe held the title under an express trust which cannot be shown by parol evidence. In an action by McCulloch that would be true, but, in legal effect, this is an action to set aside a conveyance in fraud of creditors, and the rule is never applied in such cases. To so apply it, would be to use the statute of frauds to perpetrate fraud.

[4] The arrangement by which McCulloch, without consideration, caused the title to pass to Joliffe instead of to himself, was in fact and in law a conveyance to defraud these claimants, and as such, and so far as

necessary to protect the rights of these claimants, equity will set it aside or disregard it.

The case of *Hewitt Lea Lumber Co. v. Sandell*, 66 Wash. 515, 119 Pac. 848, upon which respondent chiefly relies, is clearly distinguishable upon the facts, and it is in no wise in conflict with the principles here announced.

It follows that the claims of the appellant and cross-appellants should have been allowed, and ordered paid out of the proceeds of the foreclosure, prior to the mortgage.

The judgment is reversed, with directions to allow these liens in the order of their filing, subsequent to the lien of Fuller & James and prior to the lien of the mortgage.

MACKINTOSH, C. J., MITCHELL, PARKER, and ASKREN, JJ., concur.