[No. 34979. Department Two. December 31, 1959.]

THE R. H. FREITAG MANUFACTURING COMPANY, *Appellant*, v. BOEING AIRPLANE COMPANY *et al.*, *Respondents.*[1]

[1] Reported in 347 P. (2d) 1074.

*Elliott, Lee, Carney & Thomas,* for appellant.

*Skeel, McKelvy, Henke, Evenson & Uhlmann,* for respondents.

ROSELLINI, J.—This case is before the court upon the sustaining of a demurrer to the complaint of the plaintiff, Freitag Manufacturing Company, in which it was alleged that,

sometime prior to May, 1956, the defendant Boeing Airplane Company let to the defendant Pittsburgh-Des Moines Steel Company a contract for the construction of a supersonic wind tunnel on Boeing's premises in Seattle; that Pittsburgh had subcontracted to York-Gillespie Manufacturing Company of Pittsburgh, Pennsylvania, a portion of certain special work and fabrications which were required in the construction of the wind tunnel; that the financial resources and skills of York-Gillespie were not sufficient to accomplish the work required; and that at the special instance and urgent request of agents and representatives of Boeing and Pittsburgh, the plaintiff agreed to perform the machine work subcontracted to York-Gillespie as evidenced by purchase orders of that company.

The complaint further alleged, as a first cause of action:

"That the requests of the agents and representatives of the defendants were, except as hereinafter noted, oral. That the substance of said requests and agreement of defendants was to the effect that defendants desired to take advantage of plaintiff's skills, desired to expedite work which York-Gillespie was unable to do, direction as to methods and design change and verbal agreement to be responsible for work and assurances that plaintiff would have no trouble getting paid. That part of the foregoing is evidenced by three letters from the defendant Pittsburgh-Des Moines Steel Company dated May 23, 1956, June 6, 1956 and August 17, 1956, attached hereto as Exhibits A, B and C. That the plaintiff performed said work on an expedited basis and delivered part to York-Gillespie Manufacturing Company for reshipment to the defendants herein, and shipped some items directly to defendant Pittsburgh-Des Moines Steel Company. That the materials furnished by plaintiff and work performed on materials furnished to plaintiff were specially designed and manufactured to be and have been incorporated in the wind tunnel erected on the above described property. That the date of delivery of the work and materials of the plaintiff to the site of the wind tunnel commenced in October, 1956 and was completed on or about the 20th day of January, 1957."

Reference was then made to purchase orders and delivery receipts which it was alleged were attached to the com-

plaint; however, they do not appear in the transcript brought to this court.

It was alleged that, although demand had been made upon the defendants for payment of the reasonable and agreed value of the materials and work performed and delivered to and incorporated into the wind tunnel, which it was alleged was $78,393.73, payment had been refused.

It was further alleged that written notice of intention to claim a lien had been sent to Boeing on December 20, 1956, and that a notice of claim of lien was filed with the King County auditor on January 28, 1957.

In paragraph VIII of the complaint, it was alleged:

"That unknown to the plaintiff, York-Gillespie Manufacturing Company was in financial difficulty at the time of the issuance of the purchase orders aforementioned. That the Pittsburgh-Des Moines Steel Company was fully aware of the insecure financial condition of the York-Gillespie Manufacturing Company, but nonetheless assured plaintiff that it would be paid. That said defendant, Pittsburgh-Des Moines Steel Company, to protect itself in the performance of its contract with Boeing Airplane Company, and to avoid paying for work performed by plaintiff, did not disclose to plaintiff the financial condition of York-Gillespie Manufacturing Company, but, on the contrary, urged plaintiff to perform its work in an expedited basis so that said materials would be delivered prior to York-Gillespie Manufacturing Company becoming insolvent. That on November 2, 1956, York-Gillespie Manufacturing Company filed a voluntary petition in bankruptcy. That part of the work performed by plaintiff was at said time in the possession of York-Gillespie Manufacturing Company. That the defendant, Pittsburgh-Des Moines Steel Company made an arrangement with the Receiver of York-Gillespie Manufacturing Company, the details of which arrangement are unknown to the plaintiff, to secure delivery from the Receiver of the parts manufactured and furnished by the plaintiff without making any provisions for payment to plaintiff. That plaintiff believes and, therefore, avers that at all times herein mentioned, Pittsburgh-Des Moines Steel Company acted as agent for the Boeing Airplane Company in the construction of the wind tunnel and the securing of work from the plaintiff."

The plaintiff prayed for judgment against each of the defendants and for foreclosure of its lien.

While the record does not disclose the grounds upon which the trial court sustained the demurrer of the defendants, it is agreed by counsel in this court that the complaint for foreclosure of the alleged lien was deemed demurrable because it showed on its face that the plaintiff had failed to perfect its lien within the time required by law. Insofar as the plaintiff claimed a personal judgment against the defendants or either of them for breach of an alleged promise to see that they were paid, it is agreed that the court sustained the demurrer because proof of that promise is barred by the statute of frauds.

The materialmen's lien law in effect when the facts giving rise to this action occurred provided:

"Every person, firm or corporation furnishing materials or supplies to be used in the construction, alteration or repair of any mining claim, building, wharf, bridge, ditch, dyke, flume, tunnel, well, fence, machinery, railroad, street railway, wagon road, aqueduct to create hydraulic power, or any other building, or any other structure, or mining claim or stone quarry, shall, not later than five (5) days after the date of the first delivery of such materials or supplies to any contractor or agent, deliver or mail to the owner or the reputed owner of the property on, upon or about which such materials or supplies are to be used, a notice in writing, stating in substance and effect that such person, firm or corporation has commenced to deliver materials and supplies for use thereon, with the name of the contractor or agent ordering the same, and that a lien may be claimed for all materials and supplies furnished by such person, firm or corporation for use thereon; and no further notice to the owner shall be necessary. No materialmen's lien shall be enforced unless the provisions of this act have been complied with." Laws of 1911, chapter 77, § 1, p. 376.

This section was amended by the legislature in 1957 and now provides that notice shall be given within sixty days after the first delivery. (RCW 60.04.020.)

■ The plaintiff admits that the notice given Boeing was too late to perfect a lien for materials delivered more than five days prior to the date of the notice, but urges that

the statute should be construed so as to make the notice effective as to all subsequent deliveries. But we think the statute is plain and unambiguous, and to place upon it the construction suggested by the plaintiff would be to rewrite the law, eliminating the requirement that the notice be given within five days after the *first* delivery and substituting a provision that no lien can be claimed for materials delivered more than five days prior to the giving of notice. The five-day notice requirement was evidently intended to protect the owner where he has paid the contractor on the faith, inspired by the materialman's silence, that no lien will be claimed. The plaintiff's reading of the act would defeat this purpose for under it, so long as deliveries were not completed, the owner could not safely assume that no lien would be claimed.

The plaintiff also contends that its lien should be considered a labor lien, rather than a materialman's lien, because the value of the labor and skill involved in machining parts for the wind tunnel was greater than the value of the materials. (A labor lien does not require the five-day notice incident to a materialman's lien.) But we are not told what standard the court should adopt in determining where labor ends and materials begin nor how it can be that materials lose their identity as such and become labor simply because a great amount of thought and skill has gone into their construction. It is well established that labor performed upon material before delivery is not lienable as a labor lien. *Hayes v. Gwinn*, 49 Wn. (2d) 908, 307 P. (2d) 1063; *Baker v. Yakima Valley Canal Co.*, 77 Wash. 70, 137 Pac. 342. In this instance, it is not the laborer who claims the lien, but his employer who contracted to furnish materials. There appears no valid reason why the plaintiff should be given a protection not accorded to others in the same position.

Finally in support of its claim of lien, the plaintiff suggests that the allegations of the complaint are sufficient to show that the materials were sold directly to the owner (Boeing) or its agent, and that for this reason no notice was required, citing *Hayes v. Gwinn, supra; Colby & Dickinson*

*v. McCulloch,* 145 Wash. 561, 261 Pac. 86, and *Miller v. Schober,* 111 Wash. 631, 191 Pac. 800.

■ In *Colby & Dickinson v. McCulloch, supra,* it was said:

"Our first inquiry must be, Was the delivery here to a contractor or agent within the meaning of the statute? When the history of the materialman's lien law is considered, it becomes at once apparent that the legislature, in the section quoted [Rem. Comp. Stat. § 1133], intended to cover those cases where materials were sold to a contractor bound by his contract to furnish materials who was primarily liable for the purchase price, the owner being no party to the purchase and his property being only secondarily liable, in the event that the contractor failed to pay. The use of the term 'agent' seems to refer back to the prior act (§ 1129, Rem. Comp. Stat.) [P. C. § 9705], which makes every contractor, subcontractor, etc., the agent of the owner for the purposes of creating a lien. Therefore, the statutory notice is required when the purchase is made by a statutory agent, but not when made by a nonstatutory agent of the owner."

And in *Spokane Valley Lbr. & Box Co. v. Dawson,* 94 Wash. 246, 161 Pac. 1191, the previous holdings of this court were reviewed, and the principles announced are well stated in the syllabus, which reads as follows:

"Where materials are furnished to the owner upon the order of the owner's general agent in full control and management of the lands, it is not necessary to give the owner the five days' written notice of the delivery of the materials provided for by Rem. Code, § 1133."

In *Colby & Dickinson v. McCulloch, supra,* this syllabus was quoted and, in commenting upon it with approval, this court remarked that a special agent, duly authorized, would have the same authority to do the particular thing that a general agent would have.

A perusal of the allegations of the complaint in this case reveals that Boeing was the owner, Pittsburgh was the general contractor, and York-Gillespie was the subcontractor to whom the plaintiff sold the materials which are the subject matter of this suit. In spite of these explicit allegations, the plaintiff alleged:

"That plaintiff believes and, therefore, avers that at all

times herein mentioned, Pittsburgh . . . acted as agent for Boeing . . . in the construction of the wind tunnel and the securing of work from the plaintiff."

■ Relying upon *Patent Scaffolding Co. v. Roosevelt Apartments,* 171 Wash. 507, 18 P. (2d) 857, the plaintiff theorizes that Pittsburgh could have been both a general contractor (a statutory agent) and a general agent (an agent in fact) of Boeing, and that the complaint therefore sufficiently alleges a sale directly to the owner, Boeing. This theory is faulty in at least two respects. First, there is no allegation that the materials were sold directly to Pittsburgh (except for those materials which were furnished pursuant to change orders given by Pittsburgh), and second, the cited case is not authority for the proposition that one dealing with an owner can be both a general contractor and an agent at one and the same time. The holding of that case, upon the facts before the court, was that a contract between an owner and one termed by that contract a "contractor" could reserve such right of control in the owner as to make the "contractor" a mere agent, but that parties dealing with the agent had a right to rely upon the ostensible relations existing between him and the owner. The case is not authority for the proposition that one may be a contractor, and thus have the right to control the manner and method in which the work is to be done, and at the same time be an agent, having no right of control. The plaintiff alleged that Pittsburgh contracted to build the wind tunnel for Boeing; it alleged no facts which would constitute Pittsburgh either a general or a special agent of Boeing. Therefore, the allegations of the complaint do not bring the plaintiff within the class of sellers which is excepted from the requirement of notice to the owner.

■ The plaintiff urges that, upon the allegations of the complaint, if it is not entitled to a lien, it is at least entitled to personal judgment against one or both of the defendants by reason of the fact that agents of each of them assured the plaintiff that it would be paid and that it was at their urgent request that it agreed to fill the purchase orders of York-Gillespie. It is conceded that the statute of frauds,

RCW 19.36.010, renders unenforcible any special promise to answer for the debt, default, or misdoings of another. However, this court has recognized and followed the very widely accepted doctrine that, where the leading purpose of the promisor is, not to aid the third person in getting credit, but, to secure a benefit for himself, he will be considered a debtor himself, rather than a surety and the statute will not apply. *Yakima Cement Products Co. v. Williamson*, 53 Wn. (2d) 532, 335 P. (2d) 1; *Fairview Lbr. Co. v. Makos*, 44 Wn. (2d) 131, 265 P. (2d) 837; *Dybdahl v. Continental Lbr. Co.*, 133 Wash. 81, 233 Pac. 10; *Washington Printing Co. v. Osner*, 99 Wash. 537, 169 Pac. 988.

The reason for this exception was stated by the Supreme Court of the United States in a leading case (*Davis v. Patrick*, 141 U. S. 479, 487, 35 L. Ed. 826, 12 S. Ct. 58):

"The purpose of this provision was not to effectuate, but to prevent, wrong. It does not apply to promises in respect to debts created at the instance and for the benefit of the promisor, but only to those by which the debt of one party is sought to be charged upon and collected from another. The reason of the statute is obvious, for in the one case if there be any conflict between the parties as to the exact terms of the promise, the courts can see that justice is done by charging against the promisor the reasonable value of that in respect to which the promise was made, while in the other case, and when a third party is the real debtor, and the party alone receiving benefit, it is impossible to solve the conflict of memory or testimony in any manner certain to accomplish justice. There is also a temptation for a promisee, in a case where the real debtor has proved insolvent or unable to pay, to enlarge the scope of the promise, or to torture mere words of encouragement and confidence into an absolute promise; and it is so obviously just that a promisor receiving no benefits should be bound only by the exact terms of his promise, that this statute requiring a memorandum in writing was enacted. Therefore, whenever the alleged promisor is an absolute stranger to the transaction, and without interest in it, courts strictly uphold the obligations of this statute. But cases sometimes arise in which, though a third party is original obligor, the primary debtor, the promisor has a personal, immediate and pecuniary interest in the transaction, and is therefore himself a party to be benefited by the performance of the promisee. In such

cases the reason which underlies and which prompted this statutory provision fails, and the courts will give effect to the promise." 2 Williston on Contracts (Rev. ed.) 1314, § 452.

■ The allegations of the complaint in this instance are ample to support a finding that the assurances of Pittsburgh and Boeing were given to secure a benefit to themselves, a technically satisfactory and expeditious construction of the needed parts, and there is no allegation to show that they had any motive or purpose to benefit York-Gillespie. It may be that a jury would find that neither Pittsburgh's nor Boeing's main purpose was to secure a personal benefit, or that the words used were not intended to convey, or understood to convey, a promise that they would be responsible for payment in the event York-Gillespie did not pay. But that is a jury question. We said in *Dybdahl v. Continental Lbr. Co., supra*:

" . . . It is clear that the benefit to the promisor must be something more than remote, indirect or meagre. It must be substantial, direct and personal. There must be a point up to which the promise is to pay the debt of another and consequently within the statute, but beyond which it becomes an assumption by the promisor of the debt of another—in other words, the debt of the promisor—and consequently not within the statute. Whether a particular promise goes beyond that point depends entirely on the extent of the proof in the particular case. May not the rule be stated thus: If the court be satisfied that the personal benefit moving to the promisor be of such a personal, direct and substantial character as to fairly justify and naturally lead the promisor to make the debt his own, then the statute does not apply, otherwise it will?"

The defendants rely heavily upon the case of *Dixon v. Parker, Moran & Parker*, 102 Wash. 101, 172 Pac. 856, wherein it was alleged by a subcontractor that the general contractor had promised to pay for the work if the subcontractor did not. It was found in that case that the evidence was insufficient to show that a promise was made, and by way of dictum, the court stated that if such a promise had been made, it would have been within the statute of frauds. The "leading purpose" doctrine was not discussed, and ap-

parently was not argued; the case is therefore not controlling. *Seiffert Co. v. Wright*, 108 Wash. 616, 185 Pac. 577, also relied upon by the defendants, was also decided upon the facts, the court there stating,

" . . . the facts in this case fall short of establishing that the leading purpose of the promisor was to subserve some interest or purpose of his own within the meaning of the [leading purpose] rule . . ."

We think the complaint was vulnerable to demurrer only insofar as it alleged the perfection of a lien. Those portions of the complaint pertaining solely to this claim should be stricken. Otherwise the complaint is reinstated, and the cause is remanded with directions to overrule the demurrer.

The plaintiff shall have its costs on appeal.

WEAVER, C. J., HILL, FINLEY, and FOSTER, JJ., concur.

[1] Reported in 347 P. (2d) 1062.